UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

BRIAN J. SNYDER, M.D. and BRIAN JEFFREY
SNYDER M.D. P.C.,

        *Plaintiffs*,

        -against-

NEUROLOGICAL SURGERY PRACTICE
OF LONG ISLAND, PLLC and NSP MANAGEMENT
SERVICES OF LONG ISLAND, INC.,

        *Defendants*.

------------------------------------------------------------------X

**OPINION AND ORDER**

24-CV-06911 (JMW)

**A P P E A R A N C E S:**

    Brian T. Belowich
    Gregory A. Blue
    Kerry E. Ford
    **Lachtman Cohen & Belowich LLP**
    1133 Westchester Ave.
    Suite N-200
    White Plains, NY 10604
    *Attorneys for Plaintiffs*

    Marianne Monroy
    Andrew Leslie Zwerling
    John Kealey
    **Garfunkel Wild P.C.**
    111 Great Neck Road
    Suite 503
    Great Neck, NY 11021
    *Attorneys for Defendants*

**WICKS**, Magistrate Judge:

    Plaintiffs Brian J. Snyder, M.D. ("Dr. Snyder"), and Brian Jeffrey Snyder M.D. P.C. ("Snyder P.C." and collectively, the "Plaintiffs") commenced this action against Defendants

Neurological Surgery Practice of Long Island, PLLC ("NSPLI"), and NSP Management Services of Long Island Inc. ("NSP" and collectively, the "Defendants") seeking to recover, *inter alia*, payments and benefits in relation to an Employee Stock Ownership Plan ("ESOP"), which Dr. Snyder was allegedly deprived of by wrongful termination. (*See* generally ECF Nos. 1, 21.) These claims are brought pursuant to Sections 502 and 510 of the Employee Retirement Security Income Act of 1974 ("ERISA"), along with several claims for breach of contract. (*Id.*) Before the Court is Defendants' Motion to Dismiss all claims asserted in Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6) and 12(c), or in the alternative striking portions of the Amended Complaint pursuant to 12(f) (ECF No. 34), Plaintiffs' Opposition (ECF No. 36), and Defendants' Reply (ECF No. 41). For the reasons stated herein, Defendants' Motion to Dismiss (ECF No. 34) is **GRANTED**.

## BACKGROUND

### I.     Factual Background

The following allegations are drawn from Plaintiffs' Amended Complaint and are assumed true for the purposes of this Motion to Dismiss. (*See generally* ECF No. 21.) In 2001, Dr. Snyder received his M.D. from Temple University School of Medicine, completed a neurosurgery residency at the Mount Sinai School of Medicine and completed his fellowship at the University of Toronto in functional and restorative neurosurgery in 2008. (*Id.* at ¶ 12.) Following his fellowship, he began working as a neurosurgeon at Neurological Surgery, P.C. d/b/a NSPC Brain & Spine Surgery ("NSPC"). (*Id.* at ¶ 13.) From July 2009 until December 2020, Dr. Snyder was a shareholder of NSPC. (*Id.* at ¶ 14.) In December 2020, NSPC made changes to the form of its business through the creation of an ESOP.[1] (*Id.* at ¶ 15.) On December

---

[1] An ESOP is an employee stock ownership plan that is regulated under ERISA. (*Id.* at ¶ 16.)

2

23, 2020, NSP created their ESOP ("NSP ESOP"), which became effective on January 1, 2020, and had a six-year vesting schedule beginning January 1, 2020. (*Id.* at ¶ 18.) The relevant sections of the NSP ESOP are set forth below.

> Section 4.1  **Normal Retirement Date.** To the extent a Participant's Account balance has not previously become fully Vested, when a Participant has his Normal Retirement Date, his Account balance shall become one hundred percent (100%) Vested. A Participant who remains an Eligible Employee after his Normal Retirement Age shall continue to participate in this Plan until his Late Retirement Date, and may delay the distribution of his Account balance until his Required Beginning Date.
>
> Section 4.2  **Participant Disability Or Death.** To the extent a Participant's Account balance has not previously become fully Vested, if the Participant ceases to be an Eligible Employee as a result of death or Disability, the Participant's Account balance shall become one hundred percent (100%) Vested. Notwithstanding any provision of the Plan to the contrary, if a Participant dies while on active duty in the uniformed services of the United States for a period longer than thirty (30) days, such Participant shall be treated as if he had resumed employment on the day prior to his death for purposes of determining the amount of any benefits payable to the Participant's Beneficiary under this Plan.
>
> Section 4.3  **Vesting Schedule.**
>
> (a)  **Vesting Schedule.** Except as provided in Section 4.1 or Section 4.2, for each Year of Service a Participant's Vested percentage of his Account balance attributable to ESOP Contributions and Forfeitures equals the percentage in the following vesting schedule:

| Years of Service With the Employer | Percent of Vested Account Balance |
|---|---|
| Less than Two Years | 0% |
| More than Two Years but less than Three Years | 20% |
| More than Three Years but less than Four Years | 40% |
| More than Four Years but less than Five Years | 60% |
| More than Five Years but less than Six Years | 80% |
| Six Years or More | 100% |

(*Id.* at ¶¶ 19-20; Exhibit A.)

An "Eligible Employee" under the NSP ESOP is one who (i) completed one year of service and (ii) is at least twenty-one years of age. (*Id.* at ¶ 21.) Dr. Snyder met both requirements at all relevant times. (*Id.*; Exhibit A, § 1.31.) Before the creation of the ESOP,

> (i) NSPC merged with and into NSP; (ii) Dr. Snyder's shares in NSPC were converted into membership "units" in NSP, which were transferred by NSP to NSP Management; (iii) NSP Management "sold" Dr. Snyder's ownership interest in NSP to Snyder P.C. for total consideration of $8,107,142.86, including a cash payment of $3,400,000 million and an ESOP note in the principal sum of $4,707,142.86 (the "ESOP Note"); (iv) Dr. Snyder, through Snyder P.C., was "retained" to provide medical services to NSP's patients; and (v) Dr. Snyder entered into the Executive Employment Agreement with NSP Management.

3

(*Id.* at ¶ 22.)

> The above transaction required several documents to be executed including:
>
> a. The Stock Purchase Agreement, … dated December 23, 2020 between NSP Management, Alerus Financial, N.A. ("Alerus"), as trustee of the ESOP trust, and the shareholders of NSPC, including Dr. Snyder; b. The Junior Subordinated Promissory Note, … dated December 23, 2020 by which NSP Management, as borrower, promised to pay to Dr. Snyder, as noteholder, the principal sum of $4,707,142.86, together with interest (defined above as the "ESOP Note"); c. The Seller ESOP Pledge Agreement, … dated December 23, 2020 between Alerus at Trustee of the NSP Management Services of Long Island Employee Stock Ownership Trust (the "ESOP Trust"), NSP Management and Dr. Snyder (the "ESOP Pledge Agreement"); d. The Operating Agreement, … between NSP and its members, including Snyder P.C.; e. The Retainer Agreement, … by which NSP retained Snyder P.C. (which is owned solely by Dr. Snyder) as an independent contractor to provide medical services to NSP's patients; f. The Executive Employment Agreement, … between Dr. Snyder and NSP Management; and g. A Warrant to purchase 25,000 shares of Common Stock of NSP Management … (the "Warrant").

(*Id.* at ¶ 23.)

Pursuant to the Stock Purchase Agreement and prior to the closing of the transaction, NSP was formed, the shareholders of NSPC, including Dr. Snyder (collectively, the "Sellers"), became 100% owners of NSP, the Sellers contributed their ownership interests in NSP to NSP Management, NSP assigned all of the non-clinical assets of NSP to NSP Management, which included 8.7 million dollars to establish NSP Management as a management company for NSP, NSP management sold all of the ownership interests in NSP to professional corporations wholly owned by the Sellers (collectively, the "Members") for a purchase price of $113,500,000 (the "Purchase Price") and the ESOP Note was in the principal sum of $4,707,142.86. (*Id.* at ¶ 24.) Pursuant to the ESOP Pledge Agreement, in order to finance the $113,500,000 Purchase Price, NSP Management loaned $47,600,000 to the ESOP Trust (the "ESOP Loan"). (*Id.* at ¶ 25.) The proceeds of the ESOP Loan were equally divided and paid to the Members in the amount of

4

$3,400,000 upon closing. (*Id.*) "The remaining $65,900,000 of the Purchase Price was financed by a loan between the ESOP Trust and Sellers in the amount of $47,600,000, which was exchanged for ESOP Notes issued to the Sellers, each in the sum of $4,707,142.86, for an aggregate amount of $65,900,000." (*Id.* at ¶ 26.) Upon closing, Snyder P.C. had a 7.1428% membership interest in NSP. (*Id.* at ¶ 27.)

During this same relevant time, NSP and Snyder P.C. entered into the Retainer agreement, where Snyder P.C., through Dr. Snyder, agreed to provide NSP with "professional medical services in the specialty of neurosurgery and related services" for an annual salary of $650,000 and a share of NSP's cash flow. (*Id.* at ¶ 28.) Aside from that, Dr. Snyder was to receive $350,000 annually from NSP Management under the Executive Employment. (*Id.*)

An unfortunate series of events then ensued. In February 2021, Dr. Snyder was diagnosed with stage-four lung cancer. (*Id.* at ¶ 30.) This meant that Dr. Snyder had a disability within the meaning of the NSP ESOP. (*Id.* at ¶ 31.) Dr. Snyder continued working and serving as a board member. (*Id.* at ¶ 31.) As time passed, "Defendants' representatives … began bullying, harassing, and intimidating Dr. Snyder … [by] depriving him of services and resources required to perform his job effectively, and otherwise made it clear that they perceived his medical condition as a financial liability." (*Id.* at ¶ 32.)

Dr. Snyder then applied for disability insurance under NSP Management's Long-Term Disability Income Insurance Plan. (*Id.* at ¶ 33.) On or around July 3, 2023, Dr. Snyder was informed that Snyder P.C. would be removed as a member of NSP, and that he would become an employee without any ownership interest as well as removed as a board member. (*Id.* at ¶ 35.) With that, NSP attempted to terminate the Retainer Agreement and the Executive Employment Agreement when Dr. Snyder was provided a new Employee Agreement that provided: "(i)

5

Snyder P.C.'s 'participation as a Member of the [NSP] and Retainer Agreement with [NSP] terminated, effective as of July 3, 2023;' and (ii) Dr. Snyder became an employee of NSP with base salary of $350,000 per year." (*Id.* at ¶ 38.)

However, Snyder P.C.'s participation as a Member of NSP was never effectively terminated. (*Id.* at ¶ 39.) NSP unilaterally terminated the Retainer Agreement. (*Id.* at ¶ 40.) Dr. Snyder was now making well below the market rate for surgeons in the field—$350,000 per year—with representations that he would remain eligible for the NSP ESOP benefits. (*Id.* at ¶¶ 41-42.) In October of 2023, Dr. Snyder's application for partial disability insurance was approved. (*Id.* at ¶ 44.) Dr. Snyder applied for partial rather than total insurance so that he could continue working. (*Id.* at ¶ 45.)

Dr. Snyder was also informed by Defendants' accountant that he would be paid back pay and that the ESOP continued to accrue. (*Id.* at ¶ 48.) On August 13, 2024, Defendants wrongfully terminated Dr. Snyder's employment. (*Id.* at ¶ 50.) The Termination Notice stated that NSP "made the decision to end" Dr. Snyder's employment without cause "on 90 days' notice," effective November 13, 2024. (*Id.* at ¶ 51.) It also stated the decision was based "financial and operational considerations related to low productivity/revenue levels." (*Id.* at ¶ 52.) Dr. Snyder alleges that Defendants never provided any written, verbal or other notice, complaint or warning in advance of his termination of "low productivity/revenue levels" and thus, had no opportunity to cure these alleged issues. (*Id.* at ¶ 55.) Defendants terminated Dr. Snyder's employment "without cause with the motivating purpose of interfering with Dr. Snyder's attainment of rights to which he would have become entitled under the NSP ESOP if he had remained an Eligible Employee, … which was expected to close on or about December 21, 2024." (*Id.* at ¶ 56.)

Therefore, Plaintiffs seeks damages and declaratory relief for the actions described above, alleging the following causes of action: (i) Violation of ERISA §§ 502 and 510; (ii) Breach of the Employment Agreement and Breach of Covenant of Good Faith and Fair Dealing against NSP; (iii) Declaratory Judgment against NSP; (iv) Breach of the Stock Purchase Agreement and ESOP Note against NSP Management; (v) Breach of the Retainer Agreement against NSP and Breach of Executive Employment Agreement against NSP Management; and (vi) Breach of the Operating Agreement against NSP. (*Id.* at 17-24.)

## II. Procedural History

On December 19, 2024, Plaintiffs filed their Amended Complaint as of right as Defendants had not answered or otherwise moved to date. (ECF No. 21.) As to the Amended Complaint, Defendants requested a pre-motion conference. (ECF No. 25.) On January 16, 2025, Defendants requested a stay of discovery, which Plaintiffs opposed. (ECF Nos. 26-27.) The Motion to Stay was subsequently granted *in part* and *denied in part*.[2] (ECF No. 29.) Following several extensions to file the Motion to Dismiss, the parties filed their moving papers on May 2, 2025, and May 5, 2025. (ECF Nos. 34-41.) Defendants move to dismiss all of Plaintiffs' claims under the Amended Complaint pursuant to FRCP 12(b)(6) and (c), or in the alternative striking portions of the Amended Complaint pursuant to FRCP 12(f).[3] (ECF No. 34 at 1.) Oral Argument on the Motion was held on May 16, 2025. (ECF No. 43.)

---

[2] In the Memorandum and Order issued, the undersigned stated "[d]iscovery shall be stayed only with respect to depositions. Otherwise, discovery shall proceed. To the extent good cause exists to take a particular deposition (*e.g.*, de bene esse), then a motion should be filed seeking limited relief from the stay." (*Id.*)

[3] Defendants do not address FRCP 12(c) or 12(f) in their moving papers. Moreover, since no answer has been filed and issue not joined, rule12(c) is not applicable. *See* Fed. R. Civ. P. 12(c)(motion for judgment on the pleadings applies, "[a]fter pleadings are closed")Therefore, the instant motion is considered only through a Rule 12(b)(6) lens.

7

## DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also CompassCare v. Hochul*, 125 F.4th 49, 56-57 (2d Cir. 2025) (quoting *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014) ("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.")).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Annabi v. New York Univ.*, No. 24-cv-2601, 2025 WL 1066083, at *1 (2d Cir. Apr. 9, 2025) (quoting *Iqbal*, 556 U.S. at 687). To that end, complaints are properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When considering a motion to dismiss under 12(b)(6), the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, this tenet does not apply to legal conclusions or "threadbare recitals of a cause of action's elements." *Iqbal*, 556 U.S. at 663. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. More is required. Put differently, "while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions. … Factual allegations must be enough to raise a right to relief

above the speculative level. To survive dismissal, a complaint must provide enough facts to state a claim to relief that is plausible on its face." *Go New York Tours Inc. v. Gray Line New York Tours, Inc.*, No. 24-cv-2392, 2025 WL 947083, at *2 (2d Cir. Mar. 27, 2025) (quoting *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013)).

## I. Plaintiffs' Federal Claims

### A. *Claim One: Violation of ERISA §§ 502 and 510 Against Defendants*

The Amended Complaint alleges that Dr. Snyder was a plan participant in the NSP ESOP that is governed by ERISA. (ECF No. 21 at ¶¶ 67-68.) Plaintiffs allege that Defendants planned and schemed to deprive Dr. Snyder of his rights under the NSP ESOP, by terminating his employment. (*Id.* at ¶ 72.) This was done due to his cancer diagnosis, and Plaintiffs allege that Defendants failed to recognize that under the NSP ESOP, his account balance vested as a result of their actions. (*Id.* at ¶ 73.) Thus, Defendants violated ERISA § 502 by, *inter alia*, failing to pay Dr. Snyder the vested account balance upon termination. (*Id.* at ¶ 74.) Likewise, Defendants violated ERISA § 510 by unlawfully discharging Dr. Snyder as an employee with the intention of interfering with his rights and benefits. (*Id.* at ¶ 75.)

ERISA § 502 (a)(1)(B), 29 U.S.C. §1132(a)(1)(b) provides "that a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §1132(a)(1)(b). ERISA Section 510, 29 U.S.C. § 1140, provides that

> it shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this title, section 3001 [29 U.S.C. § 1201], or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant

>may become entitled under the plan, this title, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140.

In other words, § 510 seeks to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights. *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1111 (2d Cir. 1988). An essential element of plaintiff's proof under the statute is to show that an employer was at least in part motivated by the specific intent to engage in activity prohibited by § 510. *Id.* An ERISA claim fails "where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Russell v. Northrop Grumman Corp.*, 921 F. Supp. 143, 147 (E.D.N.Y. 1996) (quoting *Titsch v. Reliance Group, Inc.,* 548 F. Supp. 983, 985 (S.D.N.Y.1982), *aff'd,* 742 F.2d 1441 (2d Cir.1983)). To state a prima facie case of discriminatory discharge for the purposes of § 510, a plaintiff must plead that (i) plaintiff belonged to a protected group under ERISA, (ii) was qualified for the pensions, and (iii) was discharged or denied employment under circumstances which give rise to an inference of discrimination. *Dister,* 859 F.2d at 1114-15. The timing of the discharge and savings by Defendants give rise to circumstances that would show a motivating factor to terminate Dr. Snyder.

"Where an employee's ERISA claim is based only on a claim that the employee has been deprived of the opportunity to accrue additional benefits through more years of employment, a prima facie case requires some additional evidence suggesting that pension interference might have been a motivating factor." *Toussaint v. Interfaith Med. Ctr.*, No. 21-CV-1100 (ARR) (JRC), 2022 WL 118722, at *7–8 (E.D.N.Y. Jan. 12, 2022) (citing *Zahler v. Empire Merchs., LLC*, No. 11-CV-3163 (JG), 2012 WL 273698, at *10 (E.D.N.Y. Jan. 31, 2012)). That is not the case here. Moreover, Dr. Snyder was entitled to 100% of the vested balance upon disability as defined in

10

the ESOP. (ECF No. 21 at ¶¶ 20, 73.) Dr. Snyder alleges he was subjected to harassment and bullying as a result of his stage four cancer diagnosis and his termination was based on "financial and operational considerations related to low productivity/revenue levels." (*Id.* at ¶ 52.) Plaintiffs also allege that the Defendants' representatives "aggressively demanded" that Dr. Snyder apply for disability insurance and stated that he was "clearly disabled." (*Id.* at ¶ 33.) This conduct is precisely what ERISA seeks to prevent. *Dister,* 859 F.2d at 1111. And, at this stage of the proceeding, Plaintiffs' burden of proof is de minimis. *Russell*, 921 F. Supp. at 148.

### B. *Is Dr. Snyder a Plan Participant?*

Notwithstanding Plaintiffs' adequate pleading of the ERISA claims, there is an impenetrable obstacle that was created by Dr. Snyder himself that prevents him from seeking relief under ERISA. Pursuant to § 3.9(a)(i) of the ESOP,

> [n]o portion of this Plan attributable to … Corporation Stock acquired by this Plan in a sale to which Code §1042 applies may accrue or be allocated directly or indirectly under any plan maintained by the Employer meeting the requirements of Code §401(a) during the Non-allocation Period for the benefit of: (i) any taxpayer who makes an election under Code §1042(a) with respect to Corporation Stock.

(ECF No. 21, Exhibit A, 40.)

In simple terms, § 3.9 prohibits any Member who sold their shares and made a 1042 election from being a participant in the employee benefits plan, which Dr. Snyder concedes he did. (ECF Nos. 34-7 at 12; 41 at 4.) Furthermore, the Tax Code clearly prevents plan participation once a 1042 election is made. *See* 26 U.S.C. § 409(n). Indeed, the very language that appears in the Tax Code is reiterated within the four corners of the ESOP itself at § 3.9.[4]

---

[4] In relevant part 26 U.S.C. § 409(n) states "[a] plan to which section 1042 applies and an eligible worker-owned cooperative (within the meaning of section 1042(c)) shall provide that no portion of the assets of the plan or cooperative attributable to (or allocable in lieu of) employer securities acquired by the plan or cooperative in a sale to which section 1042 applies may accrue (or be allocated directly or indirectly under any plan of the employer meeting the requirements of section 401(a)) … during the

11

(ECF No. 41 at 4-5.) And Plaintiffs do not dispute this election. (ECF No. 36 at 2.) Thus, Defendants argue that Dr. Snyder was never a participant of the plan after he elected to avoid tax burdens once he chose the 1042 election. (*Id.*)

At oral argument, Plaintiffs took issue with this argument and argued that regardless of the 1042 election, he was treated as an "employee". (ECF No. 43.) While Plaintiffs do not dispute the election or the language of either the ESOP or Tax Code, they aver that Defendants' conduct entitled him to be eligible as a plan participant, relying primarily upon a "slide deck" presentation sent to all employees, including Dr. Snyder via email explaining the ESOP benefits to *employees*. *See* ECF No. 21 at Exhibit K ("ESOP Presentation Slide Deck"), ¶ 49. Separately, Defendants' accountant expressly represented that Dr. Snyder was to receive "every dollar for back pay plus ESOP continues to accrue for you." (ECF No. 21 at ¶ 48.)

In effect, Plaintiffs are arguing this constitutes waiver under both the Tax Code and the express terms of the ESOP. For a waiver to be valid, there must be clear intent "to relinquish [a] known right." *Neurological Surgery, P.C. v. Aetna Health Inc.,* 511 F. Supp. 3d 267, 285–86 (E.D.N.Y. 2021) (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 585 (2d Cir. 2006)); *see also Da Silva Plastic & Reconstructive Surgery, P.C. v. Empire Healthchoice HMO, Inc.*, No. 22-cv-07121 (NCM) (JMW), 2025 WL 240917, at *10 (E.D.N.Y. Jan. 17, 2025) (quoting *Beth Israel Med. Ctr.*, 448 F.3d at 585) ("Under ERISA, a waiver must be "voluntary and intentional," and requires a "clear manifestation or an intent ... to relinquish [a] known right.") That does not include "mere silence, oversight or thoughtlessness.").

---

nonallocation period, for the benefit of … any taxpayer who makes an election under section 1042(a) with respect to employer securities …." 26 U.S.C. § 409(n)(1)(A).

12

Here, there is no evidence in the Amended Complaint or moving papers that Defendants intentionally waived the express language of the ESOP that entitles Dr. Snyder to receive plan benefits. As to the ESOP Presentation Slide Deck, this was a mass-email distributed to the entire company rather than a specific presentation made just for Dr. Snyder. *See* ECF No. 34-7 at Exhibit 1. Defendants never took steps to change its policy or act contrary to the Tax Code and Plaintiffs fail to allege any conduct to show otherwise, nor do they cite any authority in support of the position that the express provisions of both the Tax Code and the ESOP could be waived by conduct.

Based upon the application of both the ESOP itself (section 3.9) and Tax Code (26 U.S.C. § 409(n)), Dr. Snyder having received the 3.4-million-dollar payout he elected to make the 1042 election. By so doing, he disqualified himself from becoming a plan participant. As such he cannot seek benefits under ERISA for his disability under § 4.3. In simple terms, Dr. Snyder cannot state this claim as he lost the ability to be a plan participant upon the 1042 election. Therefore, irrespective of the otherwise well-pleaded ERISA claims, Dr. Snyder is barred both under 26 U.S.C. § 409(n) and § 3.9 of the ESOP, and the claims under ERISA are dismissed.

## II.     **Plaintiffs' State Claims under Supplemental Jurisdiction**

Given that the ERISA claims must be dismissed, there must be an independent ground for this Court to hear these claims. Since this Court's jurisdiction was predicated on federal question jurisdiction by reason of the ERISA claims, there must be an independent basis for jurisdiction. Since the parties concede there is not diversity of citizenship between them, Plaintiffs' remaining five causes of actions rest solely upon the exercise of supplemental jurisdiction under 28 U.S.C. § 1367. The original subject matter jurisdiction of the federal district courts is limited and is set

forth generally in 28 U.S.C. §§ 1331 and 1332. "Under these statutes, a federal district court has original subject matter jurisdiction only when a 'federal question' is presented or, if the plaintiff is asserting claims under state law under the court's diversity jurisdiction, when the plaintiff and the defendants are citizens of different States and the amount in controversy exceeds the sum or value of $75,000." *Juravel v. Sigal*, No. 1:23-cv-10550, 2024 WL 218381, at *2 (S.D.N.Y. Jan. 19, 2024). Neither jurisdictional predicate exists over the state law claims.

Section 1367(a) confers on the Court "supplemental jurisdiction over all [ ] claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "For purposes of section 1367(a), claims 'form part of the same case or controversy' if they 'derive from a common nucleus of operative fact.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004)). The "trial court must consider whether any of the four grounds set out in subsection 1367(c) are present to an extent that would warrant the exercise of discretion to decline assertion of supplemental jurisdiction." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004). Under subsection 1367(c), a court may decline to exercise supplemental jurisdiction over a permissive counterclaim if: "(1) the claim raises novel issues or complex issues of State law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). As counsel for Plaintiffs agreed, this is not a novel issue under 1367(c)(1). Nor does any state claim substantially predominate over the federal claims. (ECF No. 43.)

Here, since the ERISA claim is dismissed, this Court can decline to exercise supplemental jurisdiction. "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Star Multi Care Servs., Inc. v. Empire Blue Cross Blue Shield*, 6 F. Supp. 3d 275, 293 (E.D.N.Y. 2014) (citing *Birch v. Pioneer Credit Recovery, Inc.,* No. 06–CV–6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

"The decision to exercise supplemental jurisdiction over state law claims once the claims over which the district court had original jurisdiction have been dismissed 'is within the sound discretion of the district court.'" *Silverman v. Miranda*, 116 F. Supp. 3d 289, 300 (S.D.N.Y. 2015), *aff'd sub nom*. *Silverman v. Teamster Loc. 210 Affiliated Health & Ins. Fund*, 725 F. App'x 79 (2d Cir. 2018), *as amended* (June 7, 2018) (quoting *Lundy v. Catholic Health Sys. of Long Island*, 711 F.3d 106, 117 (2d Cir. 2013)). Courts have declined to exercise supplemental jurisdiction, where ERISA claims have not survived a motion to dismiss under 12(b)(6). *See e.g.*, *Demopoulos v. Anchor Tank Lines, LLC*, 117 F. Supp. 3d 499, 513 (S.D.N.Y. 2015) (declining to exercise supplemental jurisdiction after dismissal of the ERISA claims, which provided basis for original jurisdiction); *Da Silva Plastic & Reconstructive Surgery, P.C. v. Empire Healthchoice HMO, Inc.*, No. 22-CV-07121 (NCM) (JMW), 2025 WL 240917, at *11 (E.D.N.Y. Jan. 17, 2025) (same); *Gordon Surgical Grp., P.C. v. Empire HealthChoice HMO, Inc.*, 724 F. Supp. 3d 158, 195 (S.D.N.Y. 2024) (recommending the Court decline supplemental jurisdiction over state claims and that it dismiss these claims).

15

Although, the undersigned sympathizes with Dr. Snyder's health condition, that is not a factor to consider when determining whether to exercise jurisdiction.[5] Likewise, absent this Court's original jurisdiction, this is not the proper venue for the redress he seeks. Therefore, the undersigned declines to exercise supplemental jurisdiction for the remaining five claims.[6]

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 34) is **GRANTED** as follows:

(i) Plaintiffs' ERISA claims are dismissed *with prejudice*, and

(ii) Plaintiffs' remaining state law claims are dismissed *without prejudice*.

Dated: Central Islip, New York
May 19, 2025

S O   O R D E R E D:

/S/ *James M. Wicks*
JAMES M. WICKS
United States Magistrate Judge

---

[5] At oral argument, Counsel for Plaintiffs conceded that these claims could easily be brought in state court. (ECF No. 43.) However, it was his priority to move the case along given his client's health needs. (*Id.*) On the one hand, the undersigned recognizes the need for a quick decision for Dr. Snyder. Yet, dismissal of the federal claims coupled with the lack of any 1367(c) factor present here, warrants dismissal of all claims, the latter of which may be pursued in state court.

[6] The undersigned also notes that even if the Court were to exercise supplemental jurisdiction, some of breach of contract claims include mandatory arbitration clauses. For example, Section 13(a) of the Employment Agreement expressly states following unsuccessful negotiations, the parties "shall" proceed to arbitration. That is, section 13(a) makes clear that the agreement is subject to mandatory arbitration. *Id.*; *see Palumbo v. Ross*, No. 07-CV-5378 (JS)(ETB), 2009 WL 10708951, at *6–7 (E.D.N.Y. Feb. 19, 2009) (quoting *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002) (internal quotations omitted) ("There is a strong federal policy favoring arbitration as an alternative means of dispute resolution" and any "doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability.")).